# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **KURTIS ALLEN CLIFFORD** | ) | |
| | ) | |
| **Plaintiff *pro se*,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 07-2147 (PLF)** |
| | ) | |
| **WILLIAM SIVLEY, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants, William Sivley, Howard Shulman, M.D., and Stephanie Burns, by and

through undersigned counsel, hereby move this Court, pursuant to Fed. R. Civ. P.

12(b)(1), (2), (4), and (6), to dismiss the complaint filed herein and all claims for damages

on the grounds that Plaintiff has failed to establish that this Court has jurisdiction in this

action, and because Plaintiff has failed to state a claim upon which relief can be granted.

In support of this motion, the Court is respectfully referred to the accompanying

Memorandum of Points and Authorities in Support.  A proposed Order granting

Defendants the relief requested is also attached.

Respectfully submitted,

_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_/s/_ _____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_/s/_ _____

JUDITH A. KIDWELL
Assistant United States Attorney
555 Fourth Street, N.W.- Civil Division
Room E4905
Washington, D.C. 20530
(202) 514-7250
Judith.A.Kidwell@usdoj.gov


Of Counsel:

Paul Thompson
Assistant Regional Counsel
U.S. Department of Veterans Affairs

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KURTIS ALLEN CLIFFORD | ) | |
| | ) | |
| Plaintiff *pro se*, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 07-2147 (PLF) |
| | ) | |
| WILLIAM SIVLEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | )__ | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

Plaintiff *pro se*, Kurtis Allen Clifford, filed this action on November 28, 2007,

naming as defendants William Sivley, Howard Schulman, M.D., and Stephanie Burns, all

of whom are Federal employees of the U.S. Department of Veterans Affairs ("VA").  The

primary argument raised in the complaint is that Defendants violated Plaintiff's

constitutional rights[1] by denying him lodging at the VA's Medical Center located at 50

Irving Street, N.W.,Washington, D.C. ("DC VAMC"),[2] despite the fact that Plaintiff had

---

[1] Plaintiff alleges violations of 42 U.S.C. §§ 1983 and 1985, as well as, violations of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

[2] Plaintiff had initially sought an emergency injunction to compel the DC VAMC to lodge him while he was receiving treatment.  Plaintiff also filed a motion to expedite his case and a motion to compel disclosure.  The Court denied all of Plaintiff's motions on November 26, 2007.

flown from Florida to have foot surgery.  As explained in detail below, all claims against

Defendants should be dismissed because the Court lacks subject matter jurisdiction, and

Plaintiff has failed to state a claim upon which relief can be granted.

## II.  BACKGROUND

Plaintiff is a veteran with a 100% service-connected disability.  Complaint

("Compl.") ¶ 1.  According to Plaintiff, he was denied lodging at the DC VAMC when he

traveled from Florida to Washington, D.C., for treatment and foot surgery.  Compl. ¶¶ 2-

3, II.

The Hoptel program at the DC VAMC provides temporary overnight lodging for

qualifying patients and family members of veterans.  *See* Defendants' Exhibit ("Def.

Exh.") 1.  The policies and procedures to be followed in allocating the limited number of

beds for this program are set out in Policy Memorandum 135-07, dated August 2005.  *Id*.

Hoptel beds may be provided to veteran patients who require "chemotherapy, radiation,

preoperative workups, physical therapy or other specialized treatments, but do not require

acute hospitilization.  These beds will be scheduled on a 'first come, first serve,' basis."

*Id*. at II, A.

The Hoptel "is NOT to be used as interim lodging for patients with no permanent

residence, nor is it to be used for post-operative lodging unless the patient is in

compliance with Medical Center Policy Memorandum #11-54 and [a] patient['s] physican

has documented medical stability to stay in Hoptel with family members present."  *Id*. at

2

II, B.  Veteran patients and family members utilizing Hoptel must comply with the

Hoptel's rules and regulations, which include no smoking, no alcoholic beverages, and

quiet hours.  *Id*. at III, D.

Plaintiff's records indicate that a Patient Record Flag ("PRF"), Category II-

Behavioral was entered in his records on October 10, 2005.  *See* Def. Exh. 2.  The VA has

established a system of PRFs to alert its "employees to patients whose behavior or

characteristics may pose a threat either to their safety, the safety of other patients, or

compromise the delivery of quality health care."  *See* Def. Exh. 3.  The DC VAMC

Disruptive Behavior Committee ("DBC") authorized this flag based on a Hoptel stay by

Plaintiff.  *See* Def. Exh. 2.   The DBC is a advisory group to the DC VAMC on

threatening, intimidating, and violent behavior in the DC VAMC.  *See* Def. Exh. 4.

Plaintiff's record states that he:

presented with slurred speech, unable to function independently, and
violated several Hoptel regulations, including bringing a female to his
room, smoking in his room, and leaving evidence of illegal drug use in
the room (marijuana).  He became verbally abusive and threatening to
staff as well. . . .  In view of the issues noted above, [Plaintiff] is banned
from future stays in Hoptel and will be notified in writing of Hoptel ban
and that he is to come to the Medical Center only when he has an
appointment or is need of medical/psychiatric care.

*See* Def. Exh. 2.  A subsequent addendum to this entry, dated May 8, 2006, indicated that

the DBC had reviewed Plaintiff's case on April 13, 2006, and determined that the ban on

Hoptel use was to remain in effect.  *See* Def. Exh. 2, at 2.

Plaintiff's records show that on December 6, 2005, Dr. Alpen Patel requested

3

Hoptel placement for Plaintiff because of medical appointments, however this request was subsequently cancelled by Defendant Stephanie Burns, a Recreation Therapist assigned to the Hoptel program, because of Plaintiff's ban from Hoptel use. *See* Def. Exh. 5. A similar situation occurred on June 15, 2006, when Plaintiff requested Hoptel placement for surgery in July, because he did not want to be placed in a community shelter. Plaintiff was referred to Christ House for temporary lodging due to his Hoptel ban. *See* Def. Exh. 6.

On November 15, 2006, despite his Hoptel ban, Plaintiff was allowed to stay in the Hoptel after his primary physician, Dr. Harvey S. Washington, referred him to the Hoptel. *See* Def. Exh. 7. On January 12, 2007, Plaintiff contacted Dr. Washington by telephone and requested that he be allowed to stay at the Hoptel on January 31, 2007. *See* Def. Exh. 8. However, when Plaintiff arrived at the DC VAMC he was prohibited from using the Hoptel because of the previously imposed ban by the DBC. Plaintiff then requested to speak to the Patient Advocate, Defendant William Sivley, to have the restriction removed. *See* Def. Exh. 9. Plaintiff's records do not contain any other notations concerning any requests for or referrals to the Hoptel.

On November 16, 2007, Dr. Howard M. Schulman, the DBC Chair, entered a note in Plaintiff's records concerning the removal of the patient record flag on Plaintiff with respect to the Hoptel. *See* Def. Exh.10. According to the note, the DBC had reviewed Plaintiff's case and found no incidents of violence or threats since the original flag. *Id*.

4

The DBC then voted to remove the flag. *Id.* The note also stated that the DC VAMC Hoptel Administration had advised Dr. Schulman that "according to Hoptel policy, as of October 2007," Plaintiff "was not eligible for Hoptel housing." *See* Def. Exh. 10, 11.

### III. THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

This Court is without personal jurisdiction over Defendants in their individual capacities in the absence of proper service. It is well established that, in an action against a federal employee in an individual capacity, the individually sued defendant must be served with process in accordance with rules applicable to individual defendants. *See Simpkins v. District of Columbia Govt.,* 108 F.3d 366 (D.C. Cir. 1997); *Lawrence v. Acree*, 79 F.R.D. 669, 670 (D.D.C. 1978); *Delgado v. Bureau of Prisons*, 727 F. Supp. 24 (D.D.C. 1989). Rule 4 of the Federal Rules of Civil Procedure requires that a copy of the summons and complaint be delivered to a defendant (or his appointed agent) personally, or be left "at his dwelling house or usual place of abode with some person of suitable age and discretion" who resides therein. *Lawrence*, 79 F.R.D. at 670. Service on the Attorney General of the United States or the United States Attorney for the district in which the action is brought, pursuant to the rules applicable to official capacity suits, "does not obviate the requirement of personal service . . . where the action is in substance against a federal official in his individual capacity." *Lawrence v. Acree*, 79 F.R.D. at 670; *Delgado v. Bureau of Prisons*, 727 F. Supp. at 27.

To the extent that Plaintiff seeks relief against federal employees in an individual

capacity, the Court must acquire personal jurisdiction in order to enter a binding judgment. *Reuber v. United States*, 750 F.2d 1039, 1049 (D.C. Cir. 1984); *Griffith v. Nixon*, 518 F.2d 1195 (2d Cir.) *cert. denied*, 423 U.S. 995 (1975). Because the record in this action does not establish proper personal service upon Defendants in their individual capacities, all claims against them in such capacities should be dismissed.[3]

## IV.   THE COURT LACKS SUBJECT MATTER JURISDICTION

As explained below, the Court lacks subject matter jurisdiction in this action because:  (1) any of Plaintiff's claims for constitutional torts against the United States are barred by the doctrine of sovereign immunity; and (2) this Court lacks the authority to review the VA's benefit determination (denial of temporary lodging for Plaintiff) under 38 U.S.C. § 511.  For these reasons, the complaint herein should be dismissed.

### A.  Governing Law and Standard of Review

#### 1.    Fed. R. Civ. P. 12(b)(1)

A motion under 12(b)(1) "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), *aff'd*, 213 F.3d 735 (D.C. Cir. 2000), *cert. denied*, 531 U.S. 1153 (2001).  "In reviewing a motion to dismiss

---

[3] A pro se litigant such as Plaintiff must be afforded more latitude to correct defects in service of process in his pleadings than other litigants who are represented by counsel. *See Moore v. Agency for Int'l Dev.*, 944 F.2d 874, 876 (D.C. Cir. 1993). However, as discussed herein, in light of the other bases for dismissal of this case, Defendants submit that no purpose would be served by granting such indulgences in this case.

for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Thompson v. Capitol Police Board*, 120 F. Supp. 2d 78, 81 (D.D.C. 2000) (citations omitted). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao, Dep't. of Labor*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001) (citations omitted), *affirmed*, 346 F.3d 192 (D.C. Cir. 2003), *cert. denied*, 543 U.S. 809 (2004). In addition, "[o]n a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a preponderance of the evidence." *Thompson*, 120 F. Supp. at 81.

A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) in two ways. First, the court may determine the motion based solely on the complaint. *Herbert v. National Academy of Science*, 974 F.2d 192, 197 (D.C. Cir. 1992). Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. *Id*.

7

2.   **38 U.S.C. § 511**

Title 38, United States Code, Section 511, as amended by the Veterans' Judicial

Review Act ("VJRA"),[4] and the Department of Veterans Affairs Codification Act,[5]

provides in pertinent part that:

> The Secretary [of Veterans Affairs] shall decide all questions
> of law and fact necessary to a decision by the Secretary
> under a law that affects the provision of benefits by the
> Secretary to veterans or the dependents or survivors of veterans.
> Subject to subsection (b), the decision of the Secretary as to
> any question shall be final and conclusive and may not be
> reviewed by any other official or by any court, whether by
> an action in the nature of mandamus or otherwise.[6]

38 U.S.C. § 511(a).  An appeal from the Secretary's decision concerning benefits is made

to the Board of Veterans' Appeals.  *See* 38 U.S.C. § 7104(a); 38 C.F.R. § 20.101(a).  An

appeal of a decision by the Board of Veterans' Appeals may be taken to the Court of

Veterans Appeals pursuant to 38 U.S.C. ch. 72.[7]

---

[4] Pub. L. No. 100-687, Div. A, § 101, 102 Stat. 4105 (1988).

[5] Former Section 211(a) of Title 38, United States Code, was recodified as Section 511 by the Veterans Affairs Codification Act, Pub. L. No. 102-83, § 2(a), 105 Stat. 378, 388 (1991).

[6] The only exceptions to preclusion of review cited in 38 U.S.C. § 511(b), are challenges to rulemaking under 38 U.S.C. § 502, certain insurance questions under 38 U.S.C. §§ 1975 and 1984, matters relating to housing and small business loans under 38 U.S.C. ch. 37, and review of Board of Veterans' Appeals decisions in the Court of Veterans Appeals under 38 U.S.C. ch. 72.

[7] The Supreme Court in *Johnson v. Robinson*, 415 U.S. 361, 369-73 (1974), recognized Congress' two-fold purpose in enacting what is now 38 U.S.C. § 511; first, to ensure that veterans' benefit claims will not burden the courts and VA with expensive and

8

In *Price v. United States*, 228 F.3d 420 (D.C. Cir. 2001) (*per curiam*), the Court of Appeals held that the district court lacked jurisdiction over the plaintiff's alleged tort claims because his underlying claim was an allegation that the VA unjustifiably denied him a veterans' benefit (*i.e.*, the VA failed to reimburse him for medical expenses he incurred while hospitalized at a non-VA medical facility), and was, therefore barred by 38 U.S.C. § 511(a). The Court reasoned that Price's claims for failure to reimburse would require the district court to review the VA's decision to deny him benefits. *Price v. United States*, 228 F.3d at 421. In *Price*, the Court noted that "courts have consistently held that a federal district court may not entertain constitutional or statutory claims whose resolution would require the court to intrude upon the VA's exclusive jurisdiction." *Id*. at 422, (citing *Beamon v. Brown*, 125 F.3d 965, 972-74 (6th Cir. 1997); *Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996); *Hicks v. Small*, 69 F.3d 967, 970 (9th Cir. 1995); *Sugrue v. Derwinski*, 26 F.3d 8, 11 (2d Cir. 1994); and *Rosen v. Walters*, 719 F.2d 1422, 1425 (9th Cir. 1983)).

However, in *Thomas v. Principi*, 394 F.3d 970 (D.C. Cir. 2005) (involving a veteran's failure to inform claim), the Court distinguished its decision in *Price,* holding that the Veterans' Judicial Review Act, 38 U.S.C. § 511, does not deprive a district court of jurisdiction in instances in which a plaintiff's claims do not involve a decision by the

---

time-consuming litigation, and second, to ensure that the technical and complex determinations and applications of VA policy regarding such claims will be adequately and uniformly made.

9

Secretary to deny benefits.  Subsequently, in *Broudy v. Mather*, 460 F.3d 106 (D.C. Cir. 2006), the Court clarified its holding in *Price* in deciding that 38 U.S.C. § 511(a) precludes judicial review in instances in which the Secretary has reviewed and acted upon a benefits claim, not in situations "where the Secretary has not 'acted' at all on the issues." *Id.* at 115.

### B.  The Court Lacks the Authority to Review the Veterans Administration's Decision To Deny Plaintiff Temporary Lodging

In this case, Plaintiff's claims against Defendants seek district court review of the VA's decision to deny Plaintiff temporary lodging at the DC VAMC.  This decision was made pursuant to policies of the VA concerning the Hoptel program and pursuant to delegated authority by the Secretary.  *See* Def. Exhs. 1, 3, 4, 11; 38 C.F.R. § 1.218(a).[8] The Court's review of the VA's decision in this matter is, therefore, foreclosed by 38 U.S.C.

§ 511(a).  *Broudy v. Mather,* 460 F.3d 106 (D.C. Cir. 2006); *Price v. United States*, 228 F.3d 420 (D.C. Cir. 2001).  Accordingly, Plaintiff's claims should be dismissed.

---

[8] The Chief of Staff approves the entry of all patient flags based on the DBC's recommendation.  *See* Exh. 4.  The Medical Center Director, who signed this delegation of authority, has been delegated the authority by the Secretary to maintain order in their facilities.

10

### C.  Plaintiff's Claims Against Defendants in Their Official Capacities Are Barred by the <u>Doctrine of Sovereign Immunity</u>

Plaintiff's complaint alleges a "civil tort," but absent a waiver, sovereign immunity shields the Federal government and its agencies from suit.  *Loeffler v. Frank*, 486 U.S. 549, 554 (1988).  Sovereign immunity is jurisdictional in nature.  *See United States v. Sherwood*, 312 U.S. 584 (1941); *see also United States v. Mitchell*, 463 U.S. 206 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction")).

To the extent that Plaintiff seeks damages, the FTCA is the exclusive remedy to obtain money damages arising from the negligent or wrongful act of any federal employee acting within the scope of employment.  *See* 28 U.S.C.  § 2679(b)(1).  The FTCA mandates that the United States be substituted as the proper defendant in the event that Plaintiff seeks monetary damages from Defendants in their official capacities.  However, in this case, any such claims by Plaintiff would fail because there is no evidence that Plaintiff filed an administrative claim with the relevant federal agency and had that claim denied in writing.  *See* 28 U.S.C. §2675(a).  Presentment of an administrative claim is a jurisdictional prerequisite to suit under the FTCA.  *See, e.g., GAF Corporation v. United States*, 818 F.2d 901, 905 (D.C. Cir. 1987).

In addition, Plaintiff's claims would be barred by the doctrine of sovereign immunity, because they are in reality claims against the United States for which sovereign

11

immunity has not been waived. *See Federal Deposit Insurance Corporation v. Meyer*,

510 U.S. 471 (1994) (holding that a constitutional tort claim is not cognizable against a

federal agency under the jurisdictional grant of the Federal Tort Claims Act)). Therefore,

to the extent that Plaintiff seeks money damages under the FTCA, his claims must be

dismissed.[9]

## V.  PLAINTIFF HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

### A.  Governing Law and Standard of Review

A complaint must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure for failure to state a claim upon which relief can be granted if it does not

plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v.*

*Twombly*, — U.S. —, 127 S.Ct. 1955, 1974 (May 21, 2007) (clarifying the traditional

12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). When

evaluating a motion for failure to state a claim upon which relief can be granted pursuant

to Fed. R. Civ. P. 12(b)(6), the Court "must treat the complaint's factual allegations as

true and must grant the plaintiff the benefit of all inferences that can be derived from the

facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)

(internal quotation marks and citations omitted). However, the Court need not accept

---

[9] The United States also would be entitled to assert any defense based upon qualified immunity which otherwise would have been available to the employees. *See* 28 U.S.C. § 2674.

"inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks and citations omitted). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl.*, 127 S.Ct. at 1965.

As discussed below, Plaintiff has failed to allege any facts to support his claims under 42 U.S.C. §§ 1983 or 1985, or to support his claims for violations of constitutional rights. Accordingly, these claims should be dismissed for failure to state a claim upon which relief can be granted.

**B. Plaintiff Has Failed to State a Claim For Relief Under 42 U.S.C. §§ 1983 or 1985**

Plaintiff's complaint states that it is brought pursuant to "Article 42 section 1983 and 1985 USCA." *See* Comp. at 1. For purposes of this motion, Defendants have assumed that Plaintiff is referring to 42 U.S.C. §§ 1983 and 1985.

**1.     42 U.S.C. § 1983**

Title 42, United States Code, Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

13

"To state a valid claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (internal citations omitted).  The traditional definition of acting under color of state law requires that a defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the alleged wrongdoer is clothed with the authority of state law.' *Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

However, Defendants are federal officials, acting under color of federal law, and are not subject to suit under 42 U.S.C. § 1983.  *See District of Columbia v. Carter,* 409 U.S. 418 (1983); *Resident Council of Allen Parkway Village v. United States Dep't of Hous. and Urban Dev.*, 980 F.2d 1043 (5th Cir. 1993).  Plaintiff's claims against Defendants under 42 U.S.C. § 1983 should, therefore, be dismissed.

**2.    42 U.S.C. § 1985**

Title 42 United States Code, Section 1985 provides for a cause of action against individuals who engage in a conspiracy to interfere with civil rights. "To state a cause of action under § 1985(1), a plaintiff must allege and prove a conspiracy (1) to prevent any person by force, intimidation or threat from holding public office or (2) injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof." *Pope v. Bond*, 641 F.Supp 489 (D.D.C. 1986).

14

In light of the facts provided in the complaint, it appears that Plaintiff is not alleging a violation of this subsection.

In a similar vein, the language of 42 U.S.C. § 1985(2) is inapplicable to Defendants or the facts as alleged by Plaintiff in his complaint.  The first clause of this subsection prohibits a conspiracy to deter a party or witness in a federal court from attending or testifying in court, punishing parties or witnesses for having attended or testified in federal court or influencing or punishing federal jurors; plaintiff does not appear to refer to this clause.

The second clause of § 1985(2), provides for a cause of action against "two or more persons" who "conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws . . . ."  However, this clause applies to conspiracies to obstruct the course of justice in state courts.  *See Kush v. Rutledge*, 460 U.S. 719 (1983).  Thus, Plaintiff likewise fails to state a claim against Defendants under this clause.

Finally, to state a claim under 42 U.S.C. § 1985(3), Plaintiff must allege the existence of:  (1) a conspiracy; (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally

protected right of privilege. *Griffen v. Breckenridge*, 402 U.S. 88, 101 (1971) (section 1983(3) was not intended to provide a federal remedy for "all tortious, conpiratorial interferences with the rights of others.")). Plaintiff must also have alleged that there was some racial or class based invidiously discriminatory animus behind the conspirator's actions. *Id*. at 101-02. Plaintiff's complaint fails to include any such allegations.

For these reasons, Plaintiff has failed to state any claims against Defendants under 42 U.S.C. §§ 1983 or 1985, for which relief can be granted. Accordingly, these claims should be dismissed.

## C.  **The Complaint Fails To State A Claim for Constitutional Violations**

For the reasons set forth herein, there is no need for the court to reach the merits of Plaintiff's allegations that Defendants' actions somehow violated his constitutional rights, particularly when Plaintiff has failed to set forth any claim for damages. *See* Compl. at II. Nevertheless, even if the Court were to address any such claims, it is clear that they are meritless.

Plaintiff's complaint generally alleges that Defendants deprived him of rights secured by the "First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution" by denying him lodging at the DC VAMC. *See* Compl. at II.  Although Plaintiff does not articulate the precise theory under which these Defendants might have violated the Constitution, the complaint may be read to suggest that somehow Defendants deprived Plaintiff of his First Amendment right of freedom of speech, his Fifth

16

Amendment right to due process of law,[10] an Eighth Amendment right,[11] and his

Fourteenth Amendment rights of due process of law and equal protection of the laws.[12]

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971), the Supreme Court held that federal officials can be held liable in their

individual capacities for violations of an individual's constitutional rights.  The Court

implied a cause of action for damages from the Fourth Amendment.  Subsequently, the

Supreme Court extended the *Bivens* rationale in *Davis v. Passman*, 442 U.S. 228 (1979)

(implied cause of action under the Due Process Clause of the Fifth Amendment), and

*Carlson v. Green*, 446 U.S. 14 (1980) (deceased prisoner's Eighth Amendment rights

violated by prison officials)).  In each of these cases, as in *Bivens*, the Court found that

there were no "special factors counselling hesitation in the absence of affirmative action

by Congress," no explicit statutory prohibition against the relief sought, and no exclusive

statutory alternative remedy.  *See Davis v. Passman*, 422 U.S. at 246-247; *Carlson v.*

*Green*, 446 U.S. at 18-20.

---

[10] In order to assert a due process claim, a party must set forth a protected property or liberty interest.  *See Matthews v. Eldridge*, 424 U.S. 319, 332-333 (1976).  Plaintiff has not established a property or liberty interest in government provided temporary lodging.

[11] Plaintiff's reliance on the Eighth Amendment to the Constitution would appear to be misplaced, since this Amendment was designed to protect only persons convicted of a crime.  *See, e.g., Ingraham v. Wright*, 430 U.S. 651 (1977).

[12] It is unclear from the sparse facts alleged in the complaint how Defendants, who are federal employees, could have violated the Fourteenth Amendment, which is applicable by its specific language to the States.

17

However, in *Bush v. Lucas*, 462 U.S. 367, 389 (1983), the Supreme Court refused to recognize a former Federal employee's damages action under the First Amendment, noting that Congress was better positioned than the courts to weigh the competing policy imperatives involved in creating remedies for aggrieved employees. Moreover, since deciding the earlier cases, the Supreme Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Schweiker v. Chilicky*, 487 U.S. 412, 421, 423 (1988) (refusing to create a *Bivens* remedy for a plaintiff whose Social Security disability payments were allegedly improperly denied as a result of due process violations in administration of the program); *United States v. Stanley*, 483 U.S. 669, 681 (1987) (disallowing *Bivens* actions by military personnel "whenever the injury arises out of activity 'incident to service'"); *Chappell v. Wallace*, 462 U.S. 296 (1983) (refusing to create a *Bivens* action for enlisted military personnel who alleged that they had been injured by the unconstitutional actions of their superior officers, despite the fact that they had no other remedy)). "[T]he absence of statutory relief for a constitutional violation, . . . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Schweiker v. Chilicky*, 487 U.S. at 421-22.

The Court in *Schweiker* determined that it would not create a *Bivens* remedy where the design of the Social Security program suggested that Congress had provided what it considered adequate remedial mechanisms for constitutional violations that might occur

18

in the administration of the program.  *Id.* at 424-25.  Following this reasoning, other courts have denied *Bivens* remedies in cases involving claims by veterans.  *See Thomas v. Principi*, 394 F.3d 970, 975 ( D.C. Cir. 2005) (affirming dismissal of *Bivens* claim against VA employees for failure to disclose diagnoses of mental illness for eight years); *Hicks v. Small,* 69 F.3d 967, 969 (9th Cir. 1995) (affirming the district court's well-reasoned holding dismissing a veteran's *Bivens* claim as inappropriate in light of the comprehensive, remedial structure of the VJRA); *Zuspann v. Brown*, 60 F.3d 1156 (5th Cir. 1995) (affirming dismissal of veteran's *Bivens* claim against employees of the VA for allegedly denying adequate medical care); *Sugrue v. Derwinski*, 26 F.3d 8, 12 (2nd Cir. 1994) (affirming dismissal of *Bivens* claim against VA employees in their individual capacities arising out of their alleged acts or omissions concerning benefits determination, in light of comprehensive administrative scheme)).

Accordingly, because there exists no arguable legal bases for Plaintiff's claims for any relief against Defendants, these claims should be dismissed.

## Conclusion

For the foregoing reasons, the complaint and all claims therein should be dismissed against Defendants.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

19

    /s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


    /s/
_____
JUDITH A. KIDWELL
Assistant United States Attorney
555 Fourth Street, N.W.- Civil Division
Room E4905
Washington, D.C. 20530
(202) 514-7250

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **KURTIS ALLEN CLIFFORD** | ) |
|  | ) |
| **Plaintiff** *pro se,* | ) |
|  | ) |
| **v.** | )    **Civil Action No.: 07-2147 (PLF)** |
|  | ) |
| **WILLIAM SIVLEY,** *et al.,* | ) |
|  | ) |
| **Defendants.** | ) |
| _____ | )__ |

## <u>ORDER</u>

UPON CONSIDERATION OF Defendants' Motion to Dismiss and Memorandum of

Points and Authorities in Support Thereof, any Opposition thereto, and the entire record herein, it

is this ____ day of March, 2008,

     **ORDERED**, that Defendants' motion is **GRANTED**; and it is

     **FURTHER ORDERED** that the complaint and all claims against Defendants are

dismissed with prejudice.

                        _____
                        UNITED STATES DISTRICT JUDGE

Copies to:

Defendants' Counsel by ECF

Kurtis A. Cliffford
3870 North Andrews
Apt. 310
Ft. Lauderdale, FL.  33309

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of March 2008, I caused copies of the

foregoing Motion to Dismiss, Memorandum of Points and Authorities in Support, and proposed

Order to be served by first class mail, postage prepaid, on:

Kurtis A. Cliffford
3870 North Andrews
Apt. 310
Ft. Lauderdale, FL.  33309

_____/s/_____
JUDITH A. KIDWELL
Assistant United States Attorney



**VETERANS AFFAIRS MEDICAL CENTER**
**50 IRVING STREET, N.W.**
**WASHINGTON, D.C. 20422**

| MEDICAL CENTER POLICY MEMORANDUM 135-07 | August 2005 |
|---|---|

**MEDICAL CENTER HOPTEL PROGRAM FOR PATIENTS & FAMILIES**

I.  **PURPOSE**:  To outline policy and procedures to be followed when utilizing the Hoptel program for qualifying patients and family members.

II.  **POLICY**:

 A.  The VAMC Washington, D.C. has designed a system for the provision of overnight lodging for patients and/or family members of veterans:

 1.  VA offers Hoptel beds located within the medical center which may be provided to veterans who require treatments such as chemotherapy, radiation, preoperative workups, physical therapy or other specialized treatments, but do not require acute hospitalization.  These beds will be scheduled on a "first come, first serve" basis.

 2.  Similarly, VA offers Hoptel beds to family members of veteran patients when it is recommended by a physician. Family members may be lodged in Hoptel where language and/or cultural barriers exist, terminally ill or critically ill veterans who need a family member to stay within close proximity, when assisting with travel and/or care of the veteran. The ability to lodge family members will be based on availability; VETERANS WILL ALWAYS RECEIVE PRIORITY FOR HOPTEL LODGING.

 B.  Hoptel is NOT to be used as interim lodging for patients with no permanent residence, nor is it to be used for post-operative lodging unless the patient is in compliance with Medical Center Policy Memorandum #11-54 and patients physician has documented medical stability to stay in Hoptel with family member present. Patients with active infection due to Multi-Drug Resistant Organisms including MRSA and VRE should not be lodged in Hoptel.

III.  **RESPONSIBILITIES**:

 A.  *Voluntary Service:* Monday through Friday between the hours of 7:30 am to 4:00 pm, Voluntary Service shall have primary responsibility for Hoptel.  Voluntary Service will arrange all overnight lodging after receiving a Hoptel consult.  The Hoptel Coordinator will review the circumstances creating the need for patient and/or family lodging.  Priorities are as follows:

 1.  Hoptel Lodging Criteria – eligibility for patient use of these rooms is based on the patient's medical treatment or procedure, independence in

Activities of Daily Living (ADLs), and 30 miles or more in travel distance to the Medical Center. Hoptel guests are not permitted to stay the same day as a procedure requiring sedation as stated in the Medical Center Policy Memorandum # 11-54.

B. *Hospital Referrals:* Medical Center staff wishing to refer a veteran should first contact the veterans MD, NP or PA to place a Hoptel consult. This consult should be made through the consult package in CPRS using the Hoptel template. A referral includes the veteran's name, social security number, dates lodging is requested, medical clearance and the name and number of the responsible clinic and provider.

C. *Emergency/After Hours Request:* In the event of an emergency/after hours request for Hoptel beds the Administrative Officer on Duty (AOD) is responsible for assuring a Hoptel consult has been placed through CPRS. Once the Hoptel consult has been placed, the AOD will register patients according to established criteria and notify Police Service, Facilities Management Service (FMS), Voluntary Service and the Nursing Supervisor. Voluntary Service will follow-up on the next regular business day.

D. *Lodging Agreement:* Veterans and their families lodging in the Hoptel must agree to follow Hoptel rules and regulations which include no smoking, no alcoholic beverages, quiet hours and 9am check out time. Rules and regulations will be posted in each Hoptel room.

E. *Meals:* Voluntary Service will provide veterans staying in the Hoptel beds with meal tickets to be utilized in the patient dining room. Nutrition and Food Service will supply Voluntary Service with meal tickets. Voluntary Service will notify Nutrition and Food Service if the veteran will be staying longer than 2 days to add them to patient dining room list and meal tickets will not be needed.

IV. **PROCEDURES:**

A. Veteran patients and family members who meet lodging criteria and have a consult placed will register through Voluntary Service. Daily notification will be given to the AOD, Police Service, Social Work, Nursing Supervisory staff, Nutrition and Food Service and FMS regarding room occupancy. The Hoptel Coordinator will issue codes for room entry. A resource directory and a list of Hoptel Rules and Regulations are located in each room.

1. Arrangements for use of the Hoptel rooms will be made by the AOD daily after 4:00 pm and/or weekends.

2. FMS will provide daily cleaning of all Hoptel rooms in preparation for the next guest. Special requests for non-routine cleaning, linen change, etc. will be made through Voluntary Service.

B.  A list of local motels/hotels will be maintained by Voluntary Service and made available to families for whom Hoptel is not appropriate. The cost of this lodging will be the sole responsibility of veteran and/or family member.

C.  After hours, the AOD may contact the Chief, Voluntary Service, for instructions related to use of the Hoptel beds.

V.      **REFERENCES**: None

VI.     **RESCISSION**: MCPM 122-02 dated March 2002

VII.    **EXPIRATION DATE**: March 2008

VIII.   **RESPONSIBLE SERVICE**: Voluntary Service


SANFORD M. GARFUNKEL
Medical Center Director

LOCAL TITLE: PATIENT RECORD FLAG CATEGORY II - BEHAVIORAL
DATE OF NOTE: OCT 10, 2005@11:41      ENTRY DATE: OCT 10, 2005@11:42:02
      AUTHOR: AMDUR,DEBORAH      EXP COSIGNER:
      URGENCY:                    STATUS: COMPLETED
   INSTITUTION: WASHINGTON
      DIVISION: WASHINGTON VAMC



   *** PATIENT RECORD FLAG CATEGORY II - BEHAVIORAL Has ADDENDA ***


The Disruptive Behavior Committee (DBC), a multidisciplinary committee of
senior clinical and administrative staff who operate under the auspices of
the Chief of Staff, has authorized the entry of a Local Patient Record Flag
in this patient's medical record.  Based upon the DBC's review of several
incidents involving this patient, medical records and other available
documentation, the DBC has concluded that Mr. Clifford represents a risk for
future disruptive behavior.  Further, by making possible the delivery of safe
and appropriate health care despite the patient's behavior, the DBC has
concluded that the entry of a Local Patient Record Flag assignment will
contribute to the quality of this patient's care and to the safety of other
patients and employees.

The DBC routinely reviews all Patient Record Flags on a periodic basis.  This
flag will be reviewed in six months.

Patient Record Flag assignments are entered using the PRF Software.  CPRS
Progress Note Documentation provides the justification for the decision to
implement these behavioral limits on this patient, as summarized briefly
below. Questions about the flag advisory may be directed to the DBC through
its Chairperson at ext 8338 or to the Office of the Chief of Staff at ext
8225.

Specifics about this case include:
During a recent stay in Hoptel, Mr. Clifford presented with slurred speech,
unable to function independently, and violated several Hoptel regulations
including bringing a female to his room, smoking in his room, and leaving
evidence of illegal drug use in the room (marijuana).  He became verbally
abusive and threatening to staff as well.  Mr. Clifford has a dx. of bipolar
disorder (indicated in notes from Miami VA), abuse of narcotics, polysubstance
abuse, drug-induced mood disorder, organic affective disorder, ADD and s/p
multiple head injuries.  He does reportedly have significant neck and lower back
pain, as well as migraines.  He has hx. of non-compliance with psychiatric
treatment regimens, and moves between Washington D.C. and Florida - having notes
this past summer from the West Palm Beach and Miami VAMC.

In view of issues noted above, Mr. Clifford is being banned from future stays in
Hoptel and will be notified in writing of Hoptel ban and that he is to come to
the Medical Center only when he has an appointment or is in need of
medical/psychiatric care.  Recommendation will be made for intensive psychiatric
case management and coordination with care-sites in Florida.

/es/ DEBORAH AMDUR
Chief, Social Work Service
Signed: 10/10/2005 12:04

```
Receipt Acknowledged By:
10/17/2005 12:24            /es/ VINCENT TOMASINO
                                MD, ATTENDING
* AWAITING SIGNATURE *          PATO,MICHELE T MD

10/14/2005 09:00           /es/ Stephanie W Burns, CTRS
                                Recreation Therapist
```

05/08/2006 ADDENDUM                    STATUS: COMPLETED
The Disruptive Behavior Committee reviewed this case on 4/13/06 and determined
that the Patient Record Flag should remain in place due to Veteran having
slurred speech and seen to be 'nodding out' during recent visit to the Medical
Center.  Ban on Hoptel use to remain in effect.

/es/ DEBORAH AMDUR. LCSW
ASSISTANT TO DIRECTOR
Signed: 05/08/2006 18:13

Receipt Acknowledged By:
* AWAITING SIGNATURE *          GORMAN,PAULA

Department of Veterans Affairs                 **VHA DIRECTIVE 2003-048**
Veterans Health Administration
Washington, DC  20420                          **August 28, 2003**

## NATIONAL PATIENT RECORD FLAGS

**1. PURPOSE:** This Veterans Health Administration (VHA) Directive outlines policy and guidance for the proper use of Patient Record Flags (PRFs).

**2. BACKGROUND:** PRF alerts VHA employees to patients whose behavior or characteristics may pose a threat either to their safety, the safety of other patients, or compromise the delivery of quality health care. PRF helps ensure the rights of all patients to receive confidential, safe, and appropriate health care and provides a safe work environment for employees.

   a. Health care workers experience the highest rate of injuries from work place assault in the United States. Health care is one of only two industries that have merited special attention from Occupational Safety and Health Administration (OSHA) (see subpars. 5a and 5b). In recognition, VHA has initiated a broad-based program of violence prevention, including performance monitors through the Office of the Deputy Under Secretary for Operations and Management. Efforts have included the redesign of the basic course "Prevention and Management of Disruptive Behaviors," and the development of new courses for geriatrics and other disciplines.

   b. The Joint Commission on Accreditation of Health Care Organizations (JCAHO) recently made patient violence and its prevention a focus of the Environment of Care Standards (see subpar. 5c).

   c. Recent studies have shown that The Department of Veterans Affairs (VA) health care facilities are not immune from these safety concerns (see subpars. 5d and 5e). The VA Office of Inspector General (OIG) in its report "Evaluation of VHA's Policies and Practices for Managing Violent or Potentially Violent Psychiatric Patients" (6HI-A28-038, dated March 28, 1996) recommended that facilities communicate among themselves so that staff are aware of high-risk patients regardless of where in the VHA system they may seek health care (see subpar. 5f).

   d. Computer-based advisories that alert clinicians to a patient's risk of violence have been in use for many years within some facilities (see subpar. 5g). However, for PRFs to assist in the prevention of adverse events when high-risk patients travel between facilities, it is important that all facilities follow uniform processes. The effectiveness of PRFs depends upon limiting their use to those unusual clinical risks that threaten health care safety and quality.

   e. The safety of patients and employees, the effectiveness of care, and the patient's right to privacy need not be compromised by threats of violence. Risk of violence can be mitigated by recognition, assessment, documentation, and communication.

## THIS VHA DIRECTIVE EXPIRES AUGUST 31, 2008



**VHA DIRECTIVE 2003-048**
**August 28, 2003**

### f. Definitions

#### (1) Category I Behavioral National PRFs

(a) Category I Behavioral National PRFs are nationally approved and are to be used by all facilities. Category I PRFs describe patient behavior that may pose a threat to the safety of themselves, other patients, visitors, or employees. Category I PRFs also recommend specific behavioral limit setting or treatment-planning actions designed to reduce risk. A Category I PRF requires a documented history of violence or disruptive and/or threatening behavior in a health care setting or the documented presence of other factors that indicate a significant risk of violence. A Text Integrated Utility (TIU) Progress Note in the Computerized Patient Record System (CPRS) must accompany all Category I PRFs.

(b) Criteria for Category I PRFs may include, but are not limited to:

1. A history of physical violence against patients or staff at a medical center or clinic.

2. Documented acts of repeated violence against others.

3. Credible verbal threats of harm against specific individuals, patients, staff, or VA property.

4. Possession of weapons or objects used as weapons in a health care facility.

5. A history of suicidal or parasuicidal behavior within health care facilities.

6. A history of repeated nuisance and disruptive or larcenous behavior that disrupts the environment of care.

7. A history of sexual harassment toward patients or staff.

(2) **Category II Local PRFs.** Category II Local PRFs may be locally established by individual Veterans Integrated Service Networks (VISNs) or facilities. Category II PRFs may include patients who are enrolled in a research project or patients with documented drug-seeking behavior. The use of Category II PRFs should also be strictly limited to information that is essential for the delivery of safe and appropriate health care. A Text Integration Utility (TIU) Progress Note in the Computerized Patient Record System (CPRS) must also accompany all Category II PRFs.

**3. POLICY:** It is VHA policy that all facilities must immediately install the required patches (as they are available) and initiate facility-wide use of PRFs.

## 4. ACTION

a. **Deputy Under Secretary for Health for Operations and Management.** The Deputy Under Secretary for Health for Operations and Management (10N) is responsible for providing oversight to the VISNs to ensure that PRFs are appropriately implemented by the VISNs.

b. **VISN Director.** The VISN Director, or designee (the Network Mental Health Committee or other comparable VISN group), is responsible for oversight and implementation of this Directive at the VISN level.

c. **Medical Facility Director.** The medical facility Director, or designee, is responsible for:

(1) Ensuring that Category I Behavioral PRFs are originated and accessible. Individual Networks and facilities determine whether optional Category II PRFs are to be used. *NOTE: Attachment A, Standards for PRFs, defines the standards for the origination of, and access to, both Category I and Category II PRFs.*

(2) Establishing a process for requesting, assigning, reviewing, and evaluating PRF.

(3) Establishing a plan to transition previous behavioral Veterans Health Information and Technology Architecture (VistA), CPRS, local Class III Advisories, and any other behavioral alerts or warnings system in use, to the VHA nationally released PRF software. After September 25, 2003, only PRF computerized advisories as described in Attachment A are approved for use. Each Category I Behavioral PRF assigned to a patient must be reviewed at least every 2 years; however, reviews may be appropriate any time that a patient's violence risk factors change significantly, the patient requests a review, or for other appropriate reasons. *NOTE: It is suggested that existing Class III advisories be reviewed and assigned to the new PRF system in a manner that does not make them all come due for review at the same time. Existing advisories that are converted must fully-meet the advisories of the PRF criteria.*

(4) Installing patches DG*5.3*425, OR*3*173, TIU*1*165, and USR*1*24.

(5) Training appropriate staff.

(6) Evaluating the facility process to ensure that PRFs are assigned appropriately.

(7) Ensuring that each PRF in a patient's record is accompanied by a TIU Progress Note. The TIU titles utilized must be:

(a) PRF Category I, and

(b) PRF Category II.

d. **Chief of Staff (COS).** The COS is responsible for:

**VHA DIRECTIVE 2003-048**
**August 28, 2003**

(1) Instituting procedures to ensure that PRF and associated processes are ethical, effective, and reviewed as noted in this Directive.

(2) Identifying a Disruptive Behavior Committee which reports to the COS.

(a) The Disruptive Behavior Committee is responsible for:

1. Coordinating the treatment plan with appropriate clinicians responsible for the patient's medical care.

2. Implementing the standards in Attachment A.

3. Collecting and analyzing incidents of patient disruptive, threatening, or violent behavior.

4. Assessing the risk of violence in individual patients.

5. Identifying system problems.

6. Identifying training needs relating to the prevention and management of disruptive behavior.

7. Recommending to the COS other actions related to the problem of patient violence.

(b) The Disruptive Behavior Committee needs to be comprised of:

1. A senior clinician chair who has knowledge of, and experience in, assessment of violence

2. A representative of the Prevention Management of Disruptive Behavior Program in the facility (see subpar. 5i).

3. VA Police.

4. Health Information Management Service.

5. Patient Safety and/or Risk Management.

6. Regional Counsel (ad hoc).

7. Patient Advocate.

8. Other members as needed with special attention to representatives of facility areas that are high risk for violence, e.g., emergency department, nursing home, and inpatient psychiatry.

9. Clerical and Administrative support to accomplish the required tasks.

VHA DIRECTIVE 2003-048
August 28, 2003

## 5. REFERENCES

a. Appelbaum PS, Dimieri RJ. "Protecting Staff from Assaults by Patients: OSHA Steps In," Psychiatric Services. 46(4): 333-338, 1995.

b. Guidelines for Preventing Workplace Violence for Health Care and Social Service Workers; U.S. Department of Labor, Occupational Safety and Health Administration, OSHA 3148, 1996.

c. Environment of Care Guidebook, JCAHO, 1997.

d. VA Suicide and Assaultive Behavior Task Force. Report of a Survey on Assaultive Behavior in VA Health Care Facilities; Feb. 15, 1995.

e. Blow, FC; Barry, KL; et al. "Repeated Assaults by Patients in VA Hospital and Clinic Settings," Psychiatric Services. 50(3): 390-394: 1999.

f. OIG Evaluation of VHA's Policies and Procedures for Managing Violent and Potentially Violent Psychiatric Patients (Report No. 6HI-A28-038).

g. Drummond, D, et al., "Hospital Violence Reduction in High-risk Patients," Journal of the American Medical Association (JAMA). 261(17) 531-34, 1989.

h. Secretary's Letter to All VA Employees October 19, 2001 http://vaww.va.gov/vasafety/docs/ALL-EMPLOYEES&volunteersLTR10-19-01.doc .

i. VA Office of Occupational Safety and Health Intranet Site: http://vaww.va.gov/vasafety Includes links to the Prevention and Management of Disruptive Behavior (PMDB) VA training program.

j. Public Law 105-220, Section 508.

## 6. FOLLOW-UP RESPONSIBILITY: The Director, Mental Health Services (116) is responsible for the contents of this Directive. Questions may be addressed to 202-273-8434.

## 7. RESCISSIONS: None. This VHA Directive will expire August 31, 2008.

S/ Jonathan B. Perlin, M.D. for
Robert H. Roswell, M.D.
Under Secretary for Health

Attachment

DISTRIBUTION: CO:   E-mailed 8/28/03
               FLD:  VISN, MA, DO, OC, OCRO, and 200 – E-mailed 8/28/03

VHA DIRECTIVE 2003-048
August 28, 2003

**ATTACHMENT A**

## STANDARDS FOR PATIENT RECORD FLAGS

**1. Background.** A small but diverse group of patients who present with certain behavioral or clinical risk factors place special demands upon the health care system. It is both a privilege and a challenge for Department of Veterans Affairs (VA) health care employees and facilities to offer safe and appropriate care to patients who present with certain risk factors. The safety of these patients and the safety of staff who treat them can be enhanced when carefully designed Patient Record Flags (PRFs) immediately alert care providers to the presence of risk factors.

    a. Since some of the most challenging patients may be nomadic and because a patient's electronic health record is increasingly available to other facilities, it is essential that conventions for creating, supporting, and maintaining computerized advisories be made uniform throughout the VA health care system.

    b. PRFs should never be used to punish or to discriminate against patients; nor should they be constructed merely for staff convenience. The effectiveness of PRFs depends upon limiting their use to those unusual risks that threaten the safe delivery of health care. Threats to the effective use of PRFs are their misuse and their overuse.

    c. Providing an environment that is safe for patients, visitors, and employees is a critical factor in health care. The safety of patients and staff, as well as the effectiveness of care and patients' right to privacy and dignity, need not be compromised by threats of violence or other risk factors. Risks associated with a history of violence and other risk factors can be limited when those risks are recognized and reported. Risks need to be addressed by an interdisciplinary clinical and threat assessment group and documented, when appropriate, in the patient's treatment plan. They must also be communicated in a standardized manner to those most at risk in an encounter with a "flagged" patient.

**2. Procedures.** Each facility must demonstrate its readiness to use PRFs in a manner consistent with the standards and protocols outlined in this Directive.

    a. As part of the patient health record, all PRF are under authority of the Chief of Staff at each facility and must be reviewed at least every 2 years. A reminder for upcoming review must be generated 60 days prior to the 2-year anniversary date of each PRF. *NOTE: PRFs must be accorded the same confidentiality and security as any other part of the health record.*

    b. The Chief of Staff, or designee, at each facility is responsible for identifying those employees authorized to initiate, enter, and access PRFs. The Chief of Staff, or designee, must ensure that only those employees with a demonstrated need to know are permitted access to PRF menu options.

    c. Access to viewing PRFs is recommended for employees who are likely to be the first to encounter a "flagged" patient, prior to or at the time of the patient's visit, since these employees are usually the most at risk from a violent patient. Access includes viewing the type of PRF and

**VHA DIRECTIVE 2003-048**
**August 28, 2003**

the narrative associated with it. Those who access a PRF are responsible for communicating the PRF advisory to doctors, nurses, and others who have a need to know. The following examples are medical center staff who have direct patient contact needing to view, or be made aware of, PRFs:

    (1) Emergency room clerks and receptionists,

    (2) Administrative Officer of the Day,

    (3) Pharmacists and pharmacy technicians,

    (4) VA police officers,

    (5) Enrollment clerks,

    (6) Social Work staff,

    (7) Triage and/or telephone care staff,

    (8) Ward and clinic clerks,

    (9) Insurance and billing staff,

    (10) Receptionists,

    (11) Travel clerks,

    (12) Laboratory clerks and technicians,

    (13) All medical staff,

    (14) Patient advocates,

    (15) Nursing and unit supervisors,

    (16) Decedent Affairs Clerk,

    (17) Scheduling staff, and

    (18) Fee clerks.

    d. PRF software will be made available with the national release of Patches DG*5.3*425, OR*3*173, USR*1*24, TIU*1*165, and a Computerized Patient Record System (CPRS) GUI executable. Although facilities may respond appropriately to PRFs transmitted from other facilities, only facilities that meet the following criteria need to enter new Category I PRFs.

(1)  The facility has developed a systematic approach to collecting reports involving incidents of disruptive, threatening, or violent behavior.

(2)  There is documented interdisciplinary review and threat assessment of patient behavior.

(3)  Documentation that supports the rationale for the patient advisory may be present in other systems of records.  A Text Integration Utility (TIU) Progress Note needs to be entered at the same time as a Category I PRF.  The TIU Progress Note needs to provide general guidance to PRF users and a brief summary of the rationale for a specific patient's PRF.

(4)  Appropriate training of staff, that in the course of their duties must assess and document risk or threats as well as implement behavioral limits and treatment plans, will be documented.

(5)  A process exists for the review of each flag at least every 2 years.  A review may be appropriate when:  the risk factors change significantly, a patient with a PRF requests a review, or for other appropriate reasons as determined by the facility that established the flag.

e.  PRFs serve only to preserve and enhance the safety and appropriateness of patient care.

f.  PRFs alert staff to a potential risk only.  At each patient encounter, the examining physician or other clinician is responsible for making appropriate clinical decisions.

g.  Each facility must have clearly written definitions and criteria (that are consistent with this VHA Directive) for all Category I and Category II PRFs.

h.  PRFs need to be entered only by employees who have been trained in the technical aspects of entry, the appropriate criteria, and in the conventions for security, format, and terminology.

i.  PRFs need to be free of redundant language, slanderous or inflammatory labels, and language that provides insufficient information or guidance for action.

j.  In order for PRFs to be effective, they need to be used only when necessary.  Overuse dilutes their importance to staff.  Each facility needs to exercise great care in establishing optional Category II PRFs.  Only when there is a compelling safety or quality of care issue should additional PRF types be utilized.  A PRF is not be used for staff convenience or to address administrative concerns.  Category II PRF types must adhere to the standards as spelled out in this attachment.

k.  Patients may request an amendment to the presence or content of a PRF advisory through the facility privacy officer.

l.  The Deputy Under Secretary for Health for Operations and Management (10N) provides oversight to the VISNs to ensure that PRFs are appropriately implemented by the facilities.

m.  **Responding to PRFs.**  Staff must respond appropriately to the appearance of PRFs.

A-3

**VHA DIRECTIVE 2003-048**
**August 28, 2003**

n. **Origination of PRFs.** All VISNs must establish processes for the origination of Category I PRFs.

(1) All facilities are required to implement and respond to Category I PRFs, regardless of which facility originated the flag.

(2) All facilities must participate in utilization of PRFs, regardless of the originating facility for any individual advisory or type of PRF advisory. <u>Only the nationally developed PRF software released by the Office of Information is to be utilized</u>.

o. **PRF Maintenance.** The responsibility for ensuring the quality, timeliness, routine review, and documentation in support of a PRF advisory belongs to the originating facility.

(1) The advisory itself will reference the authorizing facility and the Chief of Staff or designee who can provide additional information about a specific PRF advisory. A facility that, in the course of providing care to a "flagged" patient, discovers new information that could influence the status of the advisory should not amend the original advisory, but needs to contact the originating facility with the pertinent information.

(2) The responsibility for maintenance of PRFs needs to be transferred when it appears that a flagged patient has relocated to a new facility. The originating facility needs to make available to the new facility, copies of all documents and records in support of the advisory.

p. **PRF Training**

(1) Training must provide instruction on how to utilize PRF software on the assignment, continuation, inactivation, and review of flags.

(2) Training content must address:

(a) Various types of PRFs,

(b) Appropriate responses,

(c) PRF confidentiality, and

(d) Compliance with Public Law 105-220 Section 508 (see subpars. 5h and 5i).



VETERANS AFFAIRS MEDICAL CENTER
50 IRVING STREET, NW
WASHINGTON D.C. 20422

MEDICAL CENTER POLICY MEMORANDUM No. 116A-10            JUNE 2005
PREVENTION AND MANAGEMENT OF DISRUPTIVE AND VIOLENT BEHAVIOR

I.      PURPOSE: To establish policy and procedures for the management and prevention of
        disruptive behavior and violence for all Medical Center patients, staff and visitors.
        Disruptive behavior and violence are operationally defined as behavior which causes
        harm to self or others and can range in intensity from verbal demands and threats to
        physical attacks, brutality and murder. The Disruptive Behavior Committee (DBC) (see
        policy 00C-45) is the advisory group on the Medical Center's response to threatening,
        intimidating, and violent behavior in the workplace.

II.     POLICY: It is the policy of this medical center that threatening, intimidating, and violent
        behavior in the workplace is considered unacceptable conduct: there will be no tolerance
        for such acts. The medical center will take appropriate actions to assure employees,
        patients, volunteers and visitors have an environment free from threatening behavior and
        violence. Actions will vary depending on the status of the person (e.g. patient or staff),
        and the severity and consequences of the incident. Actions can include criminal
        prosecution and/or disciplinary action. The medical center through the actions of the
        DBC will comply with the provisions of VHA Directive 2003-048, National Patient
        Record Flags (NPRFs), and will take appropriate actions to ensure the safety of patients,
        staff, and visitors to the facility.

III.    RESPONSIBILITIES:

        A. **The Medical Center Director (MCD)** is ultimately responsible for the
           administrative policy prescribed in this memorandum. The MCD, in collaboration
           with the COS will appoint a Chairperson of the DBC.

        B. **The Chief of Staff (COS)** or designee will exercise oversight for the functions of the
           DBC, review cases requiring clinical input at the request of the DBC Chairperson,
           and approve the entry of all patient flags.

        C. **The Chairperson of the Medical Center's Disruptive Behavior Committee
           (DBC)** in cooperation with the Service Chiefs and the Chief of Staff will implement
           the policies and procedures described in this memorandum.

        D. **The Disruptive Behavior Committee (DBC)** is the interdisciplinary resource for all
           Medical Center personnel concerning violence. It is the responsibility of the
           committee to develop, implement, and evaluate a comprehensive Prevention and
           Management of Disruptive Behavior Plan for the Medical Center. The plan is

comprised of the following four components: monitoring/evaluation, incident response (including Critical Incident Stress Debriefing), training, and prevention.

E. **All employees** have the responsibility to report any violent event or threat to their supervisor or Police Service in a timely manner and to attend violence prevention training as appropriate to their work setting.   Visitors should report any violent incident or threat to Police Service.

IV.    **PROCEDURES:**

A. **Monitoring/Evaluation:**  The monitoring and evaluation of disruptive/violent events that occur at the Washington DC VA Medical Center or at its outlying clinics are reported on the **Armstrong Report: Workplace Violent Incident Report** that is accessible on the Washington DC VA Medical Center Intranet (vaww.washington.med.va.gov) under Other Topics.  All Workplace Violent Incident Reports are automatically forwarded to the Chair of the Disruptive Behavior Committee and the Chief of Police.  The DBC Committee tracks and trends disruptive/violent incidents and determines appropriate action to follow including entry of national patient record flags and recommendations to reduce future recurrence.

B. **Response to Violent Incidents:**  The police will be the first responders to all violent incidents.  In the event that an employee feels a loss of control which could lead to a violent event or situation, he/she should call 7-BUY (7289) which is the police emergency line.  Use of the term *"Dr. Armstrong is needed"* will notify the police that there is a situation involving disruptive or potentially violent behavior.   This will summon the police who will then take control of the situation.

The police will make an immediate determination as to whether trained clinical responders are needed to assist with the situation and will call the *Armstrong Team*. Members of the *Armstrong Team* will carry pagers that will be activated when a call indicating need for assistance is placed.  An overhead page will also be made to notify other clinicians who have been trained in Prevention and Management of Disruptive Behavior of the need for the *Armstrong Team* responders.

In addition to the police, the response team shall include a minimum of: the Nurse Supervisor, the Nurse Manager in the area where the incident is occurring and the Psychiatry Officer of the Day.  The Nurse Executive for Psychiatry Service (or Acting) and the Chief of Social Work (or Acting) will respond during business hours. During business hours the Clinical Director of the Mental Health Clinic or designee will replace the Psychiatry Officer of the Day.  The larger response team is appropriate during business hours due to the increased numbers of staff/patients/visitors on site during these hours.

The role of the *Armstrong Team* responders is to assist in de-escalating the situation and provide support to the police in determining the appropriate course of action when the incident involves a patient who may have other health care issues.

The *Armstrong Team* responders do not replace the patient's treatment team. The treating physician is expected to remain in the area and resume care of the patient once the incident has been resolved and no further threat of violence appears evident. If an arrest is necessary, the treating physician will clear the patient for transport to lock-up to assure the safety of all involved. The *Armstrong Team* will also assist with crowd control and the debriefing of witnesses as appropriate.

**Critical Incident Stress Debriefing (CISD)** will be provided to the involved parties of traumatic events including patients, employees, visitors and VA police. The DBC, in collaboration with the Employee Assistance Program (EAP) will facilitate this process. The EAP maintains a list of employees trained in methods of traumatic incident intervention, including CISD. The DBC chairperson collaborates with the Coordinator of the EAP when there is a need for deployment of counselors who can respond to an incident. Critical incident stress debriefing will be a confidential process. Supervisors will be expected to support their employees' attendance at a debriefing when appropriate.

C. **Training:** Training is an essential component of violence management and prevention. Training will be provided to all medical center employees and volunteers. This training is based on the Prevention and Management of Disruptive Behavior (PMDB) guidelines developed by the Birmingham Educational Program. The content of training is standardized, but frequency of the training may vary for different employees and is based on the risk assessment level of the work area where the employee is assigned. High-risk areas include Emergency Care Service, NHCU, certain Outpatient Clinics and all Psychiatry/Substance Abuse Programs. The Chair of the DBC, in coordination with PEPL shall be responsible for the PMDB training program.

D. **Prevention:** The DBC, in coordination with the Police Service, shall be responsible for activities focused on the prevention of violence in the facility. Interventions shall include, but are not limited to panic alarms, warning letters, behavioral contracts, patient flags, police escort, etc. Training is also considered a key component of violence prevention. Recommendations for any new initiatives for violence prevention shall be brought by the DBC to facility leadership.

**Patient Record Flags:** A patient record may be electronically flagged with an alert so that the patient's presence is monitored and to alert staff to potential risk. Procedures for entering PRFs will be in accordance with VHA Directive 2003-048, National Patient Record Flags. When a patient is referred to the Disruptive Behavior Committee for review, the DBC will determine whether a PRF should be entered in collaboration with the patient's treatment team. Patient Flags will be reviewed on an

annual basis by the DBC to determine whether the flag is still appropriate. Reasons for entry of Category I (National) Behavioral National PRFs include:

    i. A history of physical violence against patients or staff at the medical center or clinic.
    ii. Documented acts of repeated violence against others.
    iii. Credible verbal threats of harm against specific individuals, patients, staff or VA property.
    iv. Possession of weapons or objects used as weapons in a health care facility.
    v. A history of suicidal or parasuicidal behavior within health care facilities.
    vi. A history of repeated nuisance and disruptive or larcenous behavior that disrupts the environment of care.
    vii. A history of sexual harassment toward patients or staff.

**Consultative Role of DBC:**  Following a violent incident. the DBC will serve in a consultative role to the patient's treatment team to help them determine an appropriate course of action. Ultimate treatment responsibility remains with the clinical team. Likewise, if a staff member engages in violent behavior, the DBC will serve in a consultative role to hospital administration and/or the employee's supervisor/Service Chief who will be responsible for determining appropriate administrative actions.

## V.  REFERENCES:

A. VHA Directive 2003-048, National Patient Record Flag. dated August 28, 2003

B. VA Office of Occupational Safety and Health Intranet Site: http://vaww.va.gov/vasafety. Includes links to the Prevention and Management of Disruptive Behavior (PMDB) VA training program.

C. Medical Center Policy Memorandum No. 00-34 Violent Behavior Prevention dated October 2002.

D. VA Suicide and Assualtive Behavior Task Force. Report of a Survey on Assualtive Behavior in VA Health Care Facilities: Feb. 15. 1995.

E. Environment of Care Guidebook. JCAHO. 1997.

F. Public Law 105-220. Section 508.

G. Secretary's Letter to all VA Employees October 19. 2001. http://vaww.va.gov/vasafety/docs/ALL-EMPLOYEES&volunteersLTR10-19-01.doc.

VI.    **RESCISSION:** Medical Center Policy Memorandum No. 00C-45 Behavior Management Advisory Committee dated October 2002.

VII.    **RESPONSIBLE OFFICE:** Social Work Service/Chief of Staff

VIII.    **EXPIRATION DATE:** June 2008

SANFORD M. GARFUNKEL
Medical Center Director

```
Current PC Provider:     WASHINGTON,HARVEY S
Current PC Team:         PURPLE
Current Pat. Status:     Outpatient
Primary Eligibility:              SERVICE CONNECTED 50% to 100%

Order Information
To Service:              HOPTEL REQUEST
From Service:            EAR,NOSE & THROAT
Requesting Provider:     PATEL,ALPEN A
Service is to be rendered on an OUTPATIENT basis
Place:                   Consultant's choice
Urgency:                 Today
Orderable Item:          HOPTEL REQUEST
Consult:                 Consult Request
Provisional Diagnosis: right ear infxn
Reason For Request:
Bed Service:
Staff Contact/Pager:
Diagnosis:right Otitis Externa
```

Please reserve [1 ] bed(s) for [few ] nights from
         (date) to             (date).

( x ) Veteran
( ) Spouse
( ) Caregiver
( ) Other:

Reason lodging requested:

( ) Medical Procedure
( ) Surgical Procedure
( ) Outpatient Appointment
( x ) Other:podiatry, dental, eye, neuro, pysch, audio, radiology
appt within next week

Clearance for Hoptel:

( x ) This patient is medically stable, independent in all
activities of  daily living, able to manage his/her own medications
and go to the Patient Dining Room without assistance.  The above
criteria
are met and this patient is cleared for lodging in Hoptel which is an
unmonitored area with no nursing staff available.

Spouse/caregiver/other

( x ) HOPTEL is an unmonitored area with no nursing staff available.
Guests staying in HOPTEL beds need to be independent in all activities
of
daily living, able to manage his/her own medications and ambulate
without
assistance. Guests understand the above criteria.

Inter-facility Information

---

**CLIN DOC: Consult**

**CLIFFORD,KURTIS ALLEN  SSN#**
System: VISTA.WASHINGTON.MED.VA.GOV

Page: 1
Printed on: Feb 27, 2008 2:54:53 pm
Division: 7835

This is not an inter-facility consult request.

```
Status:                 CANCELLED
Last Action:            CANCELLED
```

Facility

| Activity | Date/Time/Zone | Responsible Person | Entered By |
|---|---|---|---|
| CPRS RELEASED ORDER | 12/06/05 12:15 | PATEL,ALPEN A | PATEL,ALPEN A |
| PRINTED TO<br>   VOLGC103P1$PRT | 12/06/05 12:15 | | |
| CANCELLED | 12/14/05 11:17 | BURNS,STEPHANIE W | BURNS,STEPHANIE W |

Patient is banned from HOPTEL use. Police were called to notify patient.
Please do not request HOPTEL consults for this patient.


Note: TIME ZONE is local if not indicated

No local TIU results or Medicine results available for this consult
===================================== END =====================================

LOCAL TITLE: HOMELESS TEAM/CONSULT
DATE OF NOTE: JUN 15, 2006@12:00    ENTRY DATE: JUN 15, 2006@12:00:17
    AUTHOR: BRUNDIES,MARLA S    EXP COSIGNER:
    URGENCY:    STATUS: COMPLETED
INSTITUTION: WASHINGTON
    DIVISION: WASHINGTON VAMC



VA Health Care for Homeless Veterans
Initial Contact/Triage

Name: CLIFFORD,KURTIS ALLEN

Soc. Sec. #: 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
DOB: MAY 31,1958
Currently staying:
Referred by: Social Work

Presenting problem: Needs housing after surgery?

HCHV services provided:
    [X] information about HCHV program
    [] referral for intake/ongoing HCHV case management
    [] primary care referral for:
    [] drug tx
    [] psych tx
    [] med tx
    [] transportation assistance to:
    [] shelter/housing referral
    [X] community resource information: Christ House
    [] referral for food
    [X] use of phone
    [] referral to Veterans' Benefits Counselor
    [] assistance to obtain documents:
    [] DD 214
    [] birth certificate

    [X] other: Veteran wanted Hoptel placement, was told that this had to be
approved by Physician, (Flag reports that veteran had to be escorted out 10/05)

Follow-up plan: HCHV Program explained to 100% SC Veteran, who does not wish
placement in community shelter due to self report of upcoming surgery. However,
he was invited to return at 1 PM for assessment and referral if he changes his
mind. He was also given information on Community Transitional Housing (Oxford
House) and the use of a phone to contact Christ House, who he thought might
provide recovery services on completion of self reported outpatient surgery in
July. Kevin Morton provided him Christ House contact information.

Veteran spoke to Christ House nurse who asked that he call back at 1 PM as he
may qualify for housing now since he is homeless and will be having surgery in
July (surgery not schedule in CPRS). Veteran, after long conversation, stated
he will return to use phone at 1 PM.

/es/ MARLA S BRUNDIES

CLIN DOC: Progress Note
CLIFFORD,KURTIS ALLEN  SSN
System: VISTA.WASHINGTON.MED.VA.GOV

```
SOCIAL WORKER
Signed: 06/15/2006 12:23

Receipt Acknowledged By:
06/15/2006 14:53        /es/ MICHAEL A. LAMB, LCSW
                        Licensed Clinical Social Worker
06/19/2006 11:54        /es/ Kevin D. Morton, LICSW
                        Social Worker
```

CLIN DOC: Progress Note
CLIFFORD,KURTIS ALLEN  SSN#

System: VISTA.WASHINGTON.MED.VA.GOV

Page: 2
Printed on: Jan 25, 2008 3:13:18 pm
Division: 7835

　
```
LOCAL TITLE: SWS
STANDARD TITLE: SOCIAL WORK NOTE
DATE OF NOTE: NOV 15, 2006@14:08        ENTRY DATE: NOV 15, 2006@14:08:31
       AUTHOR: COLE,TONI S              EXP COSIGNER:
  INSTITUTION: WASHINGTON
     DIVISION: WASHINGTON VAMC
      URGENCY:                                   STATUS: COMPLETED
```

Veteran came to writer's office as a walk-in requesting a lodger bed in order to
make psyche (9:30 AM) and MRI (8:00 PM) appts. scheduled for tomorrow. Veteran
can no longer utilize Hoptel because he was said to have left evidence of
illegal drug use in the room and was verbally abusive to Hoptel staff. However,
veteran reported that he has since been permitted to stay in lodger beds when he
comes to the DC area for appointments. Veteran reported that he resides in
Florida which is questionable given the frequency of his appointments in DC, in
addition to him reporting the he has remained in DC since his 10-26-06 d/c from
3DE (see MHC triage note 11-1-06).

The Admissions Office said that veteran's doctor would have to place a referral
for Hoptel then they would see if a bed was available. Writer informed Dr.
Washington of veterans request and of his  history with Hoptel. Dr. Washington
said that he would place the referral; veteran was sent to the admissions office
afterwards.


/es/ TONI S. COLE
SOCIAL WORKER
Signed: 11/16/2006 07:54

CLIN DOC: Progress Note
CLIFFORD,KURTIS ALLEN  SSN# ████████
System: VISTA.WASHINGTON.MED.VA.GOV
```

```
LOCAL TITLE: ADMISSION REFERRAL
STANDARD TITLE: ADMISSION EVALUATION NOTE
DATE OF NOTE: NOV 15, 2006@13:52    ENTRY DATE: NOV 15, 2006@13:52:29
     AUTHOR: WASHINGTON,HARVEY S  EXP COSIGNER:
INSTITUTION: WASHINGTON
    DIVISION: WASHINGTON VAMC
     URGENCY:                              STATUS: COMPLETED
```

A. REGULAR/OBSERVATION/LODGER ADMISSION  spoke to social worker Ms cole and pt
Reason for Admission: homeless

Name of Admitting Resident receiving/accepting patient:


Bed Type:Lodger

Bed Service:
Ward:
Diagnosis:homeless from florida- has appoitments and MRI scan scheduled.  needs
2 days admission for lodger bed
Procedure:
Date of Procedure:
Admitting Physician: washington
Pager #: 516-3217
Comment:(e.g. Local anesth only, Obs Pre Op, Special Pre-p test):


pt has no acute medical problems that need care with admission. only needs 2
days admission so can have medical appoitment and MRI.

Will refill tape and 4 bu 4 pads-see nov 1 note. says foot area still with some
drainage but that abscess buttox has improved


/es/ HARVEY S WASHINGTON
M.D.
Signed: 11/15/2006 14:18

```
LOCAL TITLE: PCC - TELEPHONE NOTE
DATE OF NOTE: JAN 12, 2007@10:14      ENTRY DATE: JAN 12, 2007@10:14:30
     AUTHOR: WASHINGTON,HARVEY S  EXP COSIGNER:
    URGENCY:                            STATUS: COMPLETED
INSTITUTION:
   DIVISION: WASHINGTON VAMC
```

phone call from pt in florida    now in hotel room  in florida crown plazza    305 446-9000   room 422.

coming in wed to friday    january 31 st   for several appoitments and will need to stay in hoptel he says.  till feb 1

Will ask Lori cook and toni cole about this


also dr fish had ordered MRI of thoracic spine- expired, so renewed

/es/ HARVEY S WASHINGTON
M.D.
Signed: 01/12/2007 10:17

Receipt Acknowledged By:
01/24/2007 16:43       /es/ Lori Ann Cook,RN,CS
                            MH Clinic Coodinator
01/16/2007 07:27       /es/ TONI S. COLE
                            SOCIAL WORKER



```
LOCAL TITLE: SWS
DATE OF NOTE: JAN 31, 2007@15:43    ENTRY DATE: JAN 31, 2007@15:43:48
      AUTHOR: COLE,TONI S          EXP COSIGNER:
     URGENCY:                          STATUS: COMPLETED
 INSTITUTION: WASHINGTON
    DIVISION: WASHINGTON VAMC
```

Veteran came to writer's office as a walk-in requesting a lodger bed as he did
11-15-06 (see note). Based on the Hoptel restriction it was suggested by writer
and MHC Coordinator, Lori Cook, that veteran be prohibited from lodger use;
veteran was informed. In addition, veteran's Miami address is questionable as
his CPRS notes reflect monthly visits to the VAMC, sometimes several times per
month. Veteran requested to speak with a patient advocate to inquire about
having that restriction removed from his chart.


/es/ TONI S. COLE
SOCIAL WORKER
Signed: 01/31/2007 15:53

Receipt Acknowledged By:
02/02/2007 17:58      /es/ HARVEY S WASHINGTON
                           M.D.
02/02/2007 16:21      /es/ Lori Ann Cook,RN,CS
                           MH Clinic Coodinator
```



```
LOCAL TITLE: PATIENT RECORD FLAG CATEGORY II - BEHAVIORAL
STANDARD TITLE: PATIENT RECORD FLAG
DATE OF NOTE: NOV 16, 2007@12:00     ENTRY DATE: NOV 16, 2007@12:02:03
     AUTHOR: SCHULMAN,HOWARD MAR  EXP COSIGNER:
 INSTITUTION: WASHINGTON
    DIVISION: WASHINGTON VAMC
     URGENCY:              STATUS: COMPLETED
```

Disruptive Behavior Committee reviewed the flag on this veteran which was
entered in October of 2005.  There have been no incidents of violence or threats
of violence subsequent to the original flag assignment.  The Committee reviewed
the case and voted to remove the Flag.  It should be noted that Hoptel
Administration was in contact with the Chair of the Committee, the author of
this note, and indicated that according to Hoptel Policy, as of October of 2007,
the Veteran was not eligible for Hoptel housing. He continues to receive
psychiatric care from Dr.Tomasino in the MHC and continues to have ongoing
psychiatric issues.  He is 100% SC for mood disorder.

Howard M. Schulman, Ph.D.
Chair Disruptive Behavior Management Committee

/es/ HOWARD MARK SCHULMAN, PhD
Clinical Psychologist/Chief, Psychology Service
Signed: 11/16/2007 12:12



**VETERANS AFFAIRS MEDICAL CENTER**
**50 IRVING STREET, N.W.**
**WASHINGTON, D.C. 20422**

---

**MEDICAL CENTER POLICY MEMORANDUM 135-07**          **June 2007**
**MEDICAL CENTER HOPTEL PROGRAM FOR PATIENTS & FAMILIES**

---

I.      **PURPOSE:** To outline policy and procedures to be followed when utilizing the Hoptel program for qualifying patients and family members.

II.     **POLICY:**

    A. The VAMC Washington, D.C. has designed a system for the provision of overnight lodging for patients and/or family members of veterans:

        1. VA offers Hoptel beds located within the medical center which may be provided to veterans who require treatments such as chemotherapy, radiation, preoperative workups, physical therapy or other specialized treatments, but do not require acute hospitalization. These beds will be scheduled on a "first come, first serve" basis.

        2. Similarly, VA offers Hoptel beds to family members of veteran patients when it is recommended by a physician. Family members may be lodged in Hoptel where language and/or cultural barriers exist, terminally ill or critically ill veterans who need a family member to stay within close proximity, when assisting with travel and/or care of the veteran. The ability to lodge family members will be based on availability; VETERANS WILL ALWAYS RECEIVE PRIORITY FOR HOPTEL LODGING.

    B. Hoptel is NOT to be used as interim lodging for patients with no permanent residence, nor is it to be used for post-operative lodging unless the patient is in compliance with Medical Center Policy Memorandum #11-54 and patients physician has documented medical stability to stay in Hoptel with family member present. Patients with active infection due to Multi-Drug Resistant Organisms including MRSA and VRE should not be lodged in Hoptel.

III.    **RESPONSIBILITIES:**

    A. *Voluntary Service:* Monday through Friday between the hours of 7:30 am to 4:00 pm, Voluntary Service shall have primary responsibility for Hoptel. Voluntary Service will arrange all overnight lodging after receiving a Hoptel consult. The Hoptel Coordinator will review the circumstances creating the need for patient and/or family lodging. Priorities are as follows:

        1. Hoptel Lodging Criteria – eligibility for patient use of these rooms is based on the patient's medical treatment or procedure, independence in



Activities of Daily Living (ADLs), and 30 miles or more in travel distance to the Medical Center. Hoptel guests are not permitted to stay the same day as a procedure requiring sedation as stated in the Medical Center Policy Memorandum # 11-54.

B. *Hospital Referrals:* Medical Center staff wishing to refer a veteran should first contact the veterans MD, NP or PA to place a Hoptel consult. This consult should be made through the consult package in CPRS using the Hoptel template. A referral includes the veteran's name, social security number, dates lodging is requested, medical clearance and the name and number of the responsible clinic and provider.

C. *Emergency/After Hours Request:* In the event of an emergency/after hours request for Hoptel beds the Administrative Officer on Duty (AOD) is responsible for assuring a Hoptel consult has been placed through CPRS. Once the Hoptel consult has been placed, the AOD will register patients according to established criteria and notify Police Service, Facilities Management Service (FMS), Voluntary Service and the Nursing Supervisor. Voluntary Service will follow-up on the next regular business day.

D. *Lodging Agreement:* Veterans and their families lodging in the Hoptel must agree to follow Hoptel rules and regulations which include no smoking, no alcoholic beverages, quiet hours and 9am check out time. Rules and regulations will be posted in each Hoptel room.

E. *Meals:* Voluntary Service will provide veterans staying in the Hoptel beds with meal tickets to be utilized in the patient dining room. Nutrition and Food Service will supply Voluntary Service with meal tickets. Voluntary Service will notify Nutrition and Food Service if the veteran will be staying longer than 2 days to add them to patient dining room list and meal tickets will not be needed.

IV.  **PROCEDURES**:

A. Veteran patients and family members who meet lodging criteria and have a consult placed will register through Voluntary Service. Daily notification will be given to the AOD, Police Service, Social Work, Nursing Supervisory staff, Nutrition and Food Service and FMS regarding room occupancy. The Hoptel Coordinator will issue codes for room entry. A resource directory and a list of Hoptel Rules and Regulations are located in each room.

1. Arrangements for use of the Hoptel rooms will be made by the AOD daily after 4:00 pm and/or weekends.

2. FMS will provide daily cleaning of all Hoptel rooms in preparation for the next guest. Special requests for non-routine cleaning, linen change, etc. will be made through Voluntary Service.

B.  A list of local motels/hotels will be maintained by Voluntary Service and made available to families for whom Hoptel is not appropriate.  The cost of this lodging will be the sole responsibility of family member.

C.  After hours, the AOD may contact the Chief, Voluntary Service, for instructions related to use of the Hoptel beds.

V.     **REFERENCES**: None

VI.    **RESCISSION**: MCPM 122-02 dated March 2002

VII.   **EXPIRATION DATE**: March 2008

VIII.  **RESPONSIBLE SERVICE**: Voluntary Service

Fernando Rivera
Medical Center Director